NOT FOR PUBLICATION                                    (Docket No. 22)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

_____
                                                          :
C.H., *a minor, by and through her next*         :
*friend, Ronald Hudak*,                                :
                                                          :
                              Plaintiff,              :        Civil No. 09-5815 (RBK/JS)
                                                          :
              v.                                         :        **OPINION**
                                                          :
BRIDGETON BOARD OF EDUCATION,  :
DR. H. VICTOR GILSON, LYNN            :
WILLIAMS, and STEPHEN LYNCH,       :
                                                          :
                              Defendants.             :
_____  :

**KUGLER**, United States District Judge:

        This matter arises out of an alleged free speech violation at Bridgeton High School.

Plaintiff C.H. filed a Motion for Preliminary Injunction, Docket No. 22, which this Court

converted to a Motion for Permanent Injunction.  Docket No. 27.  The Court heard oral argument

on the Motion on April 19.  C.H.'s basic challenge is that her First Amendment rights were

violated when the school denied her permission to 1) wear a black and red tape armband saying

"Life," 2) distribute anti-abortion flyers during non-instructional times, and 3) wear tape over her

mouth during the school day as part of her participation in the Pro-Life Day of Silent Solidarity.[1]

For the reasons discussed below, the Court grants Plaintiff's Motion and enjoins Defendants

_____

        [1] C.H. dropped her challenge regarding the tape over her mouth.  See Pl. reply at 2 n.1.
Also, she had initially requested and received permission to remain silent during the school day.
She does not raise any challenge to that request either.

from enforcing their policies against her, per the terms of the accompanying Order.

## I.    BACKGROUND

Plaintiff C.H. is a freshman at Bridgetown High School, a public high school in New

Jersey.  In October 2009, she sought permission from school administrators to undertake certain

activities at school in conjunction with the Pro-Life Day of Silent Solidarity (DOSS), an annual

anti-abortion protest, most recently scheduled for October 20, 2009.  By Plaintiff's account, the

DOSS "is a day when students take a stand for life by remaining silent for the day, wearing pro-

life t-shirts and armbands, and distributing literature explaining whey they are silent."  Pl. br. at

4.  Plaintiff describes herself as a Christian who desires to share her views with classmates,

including her views on abortion.  Seemingly teen pregnancy is a problem at Bridgeton that even

the school acknowledges, see Def. br. at 6, ¶ 17, and Plaintiff herself knows classmates who have

had abortions.

Sometime during the week of October 5, 2009, Plaintiff informed her social studies

teacher that she planned to participate in the DOSS.  The teacher informed the school's Assistant

Principal, Stephen Lynch, about Plaintiff's intent.  Mr. Lynch then met with Plaintiff, advising

her that some of her activities may not be permitted by school rules, and asking her to summarize

the activities she sought to undertake so that he could submit them to Principal Lynn Williams

for review.

In response, Plaintiff submitted five sheets of paper later that week to Mr. Lynch.  See

Def. br., Ex. B.  The first was a handwritten description from Plaintiff of her planned activities.

She indicated that on October 20th she would do the following: 1) remain silent during class; 2)

remain silent during the entire school day; 3) handout flyers to other students about her silence;

and 4) wear a red duct tape armband with the word "LIFE" in black marker, and she would wear the band over her arm and/or mouth.  Def. br., Ex. B at 1.  The remaining four pages of her submission was a one page flyer she intended to distribute (the text of which is attached below),[2] and a three page document from the Alliance Defense Fund describing students' constitutional rights in schools as specifically applied to the DOSS.  Def. br., Ex. B at 2-5.  Mr. Lynch gave the information to Principal Williams, who in turn forwarded the information on October 16, 2009 to Superintendent Dr. H. Victor Gilson.

Later that day, Dr. Gilson gave Principal Williams a verbal response to Plaintiff's request.  Dr. Gilson stated that Plaintiff could not have tape on her mouth, no armband because it would violate the school's dress code policy, no handouts because they would violate the school's

---

[2]

### **WHY AM I SILENT**

Every day in the United States of America over **4,000 American Citizens** are silenced against their own wills.  They have their voices permanently silenced and they never get the opportunity to speak on behalf of themselves.  Today we stand in silent solidarity with those who have been silenced.  Today we are silent, but by doing this we are being a voice for the one-third of our generation that will never have a voice.  These victims are not only being silenced; they are being killed.  The **victims** we stand on behalf of are not going to be mentioned on the news.  The **victims** we stand on behalf of will not have a funeral.  The **victims** we stand on behalf of were ripped from the safety and warmth of their mother's womb.  The victims we stand on behalf of were not blobs of tissue, but beautiful human persons, with hearts that beat, brains that gave out brain waves, and a soul.  These are victims of the **abortion holocaust**.  Every day over **4,000 babies** have had their lives ended in the name of choice.  Since **January 22, 1973**, over **46 million babies have died**.  The time is now to stand on behalf of these innocent victims. Visit www.standtrue.com to find out how to be a voice.

[Picture of a young child]
I'm a LIFE . . . **NOT A CHOICE.**

Def. br. Ex. B at 2 (emphasis in original).

literature distribution policy, and Plaintiff could remain silent, though she risked her class participation grade.  Def. br. at 4, ¶ 6.  As a bit of important background, the Bridgeton School District decided to implement a strict dress code several years ago because girls were dressing provocatively, and many of the boys were displaying gang colors and insignia that incited daily fights.  Def. br. at 5, ¶ 12.  The dress code has seemingly helped with those problems.

 Principal Williams relayed Dr. Gilson's decision directly to Plaintiff, and to her father via a telephone call, seemingly on the day before Plaintiff's proposed protest.  Though it is disputed, Plaintiff says that during Principal Williams' phone call to her father, the only reason Principal Williams gave for the decision was that "religious" material was not allowed in school. Hudak declaration at ¶ 12.

At least in Plaintiff's view, Defendants' decision was perplexing given at least one other silent protest that the school had permitted.  As was conceded by Defendants at oral argument, in 2008, members of Students Against Destructive Decisions (SADD) club were permitted to wear black shirts over their uniforms, paint their faces white, and to wear signs around their necks telling the story of someone who was killed by a drunk driver.  The students remained silent to show that they were "dead."  C.H. declaration at ¶ 16.[3]

Plaintiff and her father retained counsel, who drafted and sent a demand letter to Defendants on October 21, 2009, requesting that Plaintiff's speech be permitted immediately.

---

[3] Most recently on April 16, 2010, as was disclosed on the eve of the hearing in this matter, students at Bridgeton apparently observed the Day of Silence in support of lesbian, gay, bisexual, and transgender issues.  See C.H. supplemental declaration at ¶ 2.  Students seemingly remained silent and were allowed to hand out flyers explaining why they were silent.  Id. at ¶ 5. Defendants Gilson and Williams filed supplemental affidavits explaining that they were not aware of the protest, nor did they authorize any of its activities.  See Gilson supplemental affid. at ¶¶ 4-7; Williams supplemental affid. at ¶¶ 4-9.

Seemingly Defendants never responded to the letter and Plaintiff filed this suit, alleging, inter

alia, a violation of her First Amendment right to free speech.  Plaintiff argued an "as applied" and

a facial challenge to the school's dress code policy and literature distribution policy (attached in

whole as exhibits F and H to Defendants' brief).  After Defendants argued that Plaintiff's

proposed speech would violate the school's harassment/anti-bullying policy and its equal

education policy, Plaintiff challenged those policies as well.[4]

## II.   STANDARD

In deciding whether to grant a permanent injunction, a district court must consider

whether "(1) the moving party has shown actual success on the merits; (2) the moving party will

be irreparably injured by the denial of injunctive relief; (3) the granting of the permanent

injunction will result in even greater harm to the defendant; and (4) the injunction would be in

the public interest."  Gucci America, Inc. v. Daffy's Inc., 354 F.3d 228, 236-37 (3d Cir. 2003).

## III.   DISCUSSION

At the outset, though there are four factors for granting a permanent injunction, only

success on the merits is really at issue here.  The Third Circuit held in Sypniewski v. Warren

Hills Regional Board of Education, 307 F.3d 243, 258 (3d Cir. 2002), a preliminary injunction

case, that a student whose protected speech is "stifled" suffers irreparable harm.  See also Elrod

v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal

periods of time, unquestionably constitutes irreparable injury.").  The court also found that a

--------

[4] The Court granted the American Civil Liberties Union of New Jersey leave to file an
amicus brief in this dispute, see Docket No. 32, which it did on April 24, 2010.  See Docket No.
34.  It is the Court's understanding that students at the Rutgers Constitutional Litigation Clinic
participated in the preparation of the ACLU's brief, and the Court commends those students on
their well-written, well-argued product.

school risks great harm from potential disruption of education or invasion of other students'

rights.  Sypniewski, 307 F.3d at 258.  The court further found that the public has an interest in

both the protection of student speech and "effective education."  Id.  Thus, in that case, the

success on the merits factor alone determined the outcome of the injunction, and likewise it does

so here.[5]

**A.      Basic Positions**

Plaintiff brings an "as applied" and a "facial" challenge to several of the school's policies.

Her as applied challenge is basically that her First Amendment rights were violated because

Defendants failed to show that her proposed speech was likely to materially and substantially

interfere with the discipline or the operation of the school, as required by Tinker v. Des Moines

Independent Community School District, 393 U.S. 503 (1969).  Her facial challenge is that the

school's literature distribution policy, dress code policy, harassment/anti-bullying policy, and the

equal education policy are unconstitutional as overbroad and vague.[6]  Plaintiff notes in her reply

brief, and repeated at oral argument, that if the Court finds the policies unconstitutional as

applied, then the Court need not reach whether they are facially unconstitutional.  See Pl. reply at

10 n.10.

Defendants' position is really three-fold.  First, under Tinker (if it applies) they argue that

they have made a sufficient showing of an expectation that Plaintiff's proposed speech would

---

[5] Defendants argue that Plaintiff has failed to meet factors one through three, see Def. br. at 22-24, though noticeably Defendants do not distinguish Sypniewski.

[6] Plaintiff also brings some Due Process, Equal Protection, and Free Exercise claims, but those are really ancillary to the dispute.  At oral argument, Plaintiff's counsel conceded that if the Court ruled in Plaintiff's favor on the as applied challenge, these secondary issues need not be addressed.

have caused a disruption to the educational process.  Def. br. at 11.  Second, Defendants argue

that Tinker does not apply since their restriction on speech was content and viewpoint neutral,

thus the appropriate standard is not Tinker's disruption standard, but time, place, and manner

restrictions under a forum analysis.  Def. br. at 14.  Third, Defendants argue their policies are not

constitutionally overbroad or vague, and that they provide "clear guidelines" for administrators.

Def. br. at 15.[7]

      The Court's analysis must begin with exactly which standard to apply in reviewing the

constitutionality of Defendants' actions.  Since there are two instances of speech at issue–the

armband and the flyers–which perhaps are subject to different standards, the speech is reviewed

separately.

**B.     Standard to Apply–Armband**

      The basic framework for analyzing First Amendment free speech cases with students in

public schools arises from four cases: 1) Tinker; 2) Bethel School District No. 403 v. Fraser, 478

U.S. 675 (1986); 3) Hazelwood School District v. Kuhlmeier, 484 U.S. 260 (1988), and 4) Morse

v. Frederick, 551 U.S. 393 (2007).  In Tinker, students protested the Vietnam War by wearing

black armbands to school.  The school prohibited the wearing of armbands, and the students were

suspended.  In finding that the school's actions were impermissible, the Court announced its now

---

[7] Also, the parties argued in their respective briefs, but not at oral argument, about
whether this case involves "religious" or "political" speech, and whether it invokes the
Establishment Clause or freedom of religion.  However, those arguments are really just
distractions from the central, most important issue: Did the School violate C.H.'s speech rights?
Whether the speech was political or religious is a red herring.  See Capitol Square Review &
Advisory Bd. v. Pinette, 515 U.S. 753, 760 (1995) ("Our precedent establishes that private
religious speech, far from being a First Amendment orphan, is as fully protected under the Free
Speech Clause as secular private expression.").

famous proclamation: "It can hardly be argued that either students or teachers shed their

constitutional rights to freedom of speech or expression at the schoolhouse gate."  393 U.S. at

506.  The Court announced a test for when schools can control student speech: "conduct by the

student, in class or out of it, which for any reason-whether it stems from time, place, or type of

behavior-materially disrupts classwork or involves substantial disorder or invasion of the rights

of others is, of course, not immunized by the constitutional guarantee of freedom of speech."  Id.

at 513.  The Third Circuit has described this standard as follows: "regulation of student speech is

generally permissible only when the speech would substantially disrupt or interfere with the work

of the school or the rights of other students."  Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200,

211 (3d Cir. 2001).  Tinker "requires a specific and significant fear of disruption, not just some

remote apprehension of disturbance."  Id.; Sypniewski, 307 F.3d at 253.  Indeed, as the Supreme

Court itself noted, a public school cannot be motived by a "mere desire to avoid discomfort and

unpleasantness."  Tinker, 393 U.S. at 509.

As is important and as is revisited below, the Tinker Court began its analysis by stating

that the problem before the Court was deciding what to do when the school's largely plenary

power to control the school (to which federal courts usually defer) collides with students' rights

to free speech.  393 U.S. at 507.

However, Tinker was not the final word on students' free speech rights.  Subsequent

cases have carved out student speech that can be controlled without a showing of substantial

disruption or interference, carveouts that are not at issue here.  Thus, in brief, as interpreted by

the Third Circuit, Fraser holds that a school "may categorically prohibit lewd, vulgar or profane

language."  Saxe, 240 F.3d at 214.  Hazelwood holds that a school "may regulate school-

sponsored speech (that is, speech that a reasonable observer would view as the school's own speech) on the basis of any legitimate pedagogical concern." Id. Morse holds that a school "'may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use.'" J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 593 F.3d 286, 297 (3d Cir. 2010) (quoting Morse, 551 U.S. at 400-03), vacated and rehearing en banc granted, No. 08-4138, slip order (3d Cir. Apr. 9, 2010).

Though the carveouts are not important here, how the Third Circuit treats them is. The court holds that speech falling outside of the above categories "**is subject to Tinker's general rule: it may be regulated only if it would substantially disrupt school operations or interfere with the rights of others.**"[8] Saxe, 240 F.3d at 214; Sypniewski, 307 F.3d at 254. In other words, if student speech is not lewd, school-sponsored, or advocating drug use, the speech can only be prohibited if it is likely to cause a disruption.

### 1.      Does the Tinker Standard Apply?

Defendants argue that notwithstanding the above "general rule," this case is not subject to Tinker's disruption standard at all. Defendants assert that Tinker only applies to cases involving viewpoint discrimination. Def. br. at 13-14. They further argue that where a school's policy is content and viewpoint-neutral (i.e., not under the Tinker rubric), the policies need only satisfy time, place, and manner restrictions. This means the policies need only be content neutral, narrowly tailored, and leave open alternative channels of communication. Id. at 14. Under the Third Circuit standards discussed above, Defendants' position is incorrect.

---

[8] The Third Circuit's rule arose before Morse, but nothing about that decision suggests that it is not subject to the court's existing rule, or that the existing rule should change. Cf. J.S., 593 F.3d at 298 (repeating the rule announced in Saxe, after discussing Morse).

### a.      Forum Analysis and DOSS cases

But before analysis proceeds to illuminating that conclusion, it should be pointed out that Defendants' position is not without support.  For example, at least three courts (two district, one circuit) have dealt with students participating in the Pro-Life Day of Silent Solidarity and have applied non-Tinker standards.  See M.A.L. ex rel. M.L. v. Kinsland, No. 07-10391, 2007 WL 313283 (E.D. Mich. Jan. 31, 2007), rev'd, 543 F.3d 841 (6th Cir. 2008); Raker v. Frederick County Public Sch., 470 F. Supp. 2d 634 (W.D. Vir. 2007).  In M.A.L., a middle school student was prevented from handing out leaflets in school hallways between classes.  543 F.3d 841, 843-44.  The leaflet contained the exact language of C.H.'s proposed flyer.  See 2007 WL 313283, at *3.  The school had a policy requiring pre-submission of materials to the principal or his/her designee before distributing materials, which the plaintiff-student failed to do.  543 F.3d at 845.  Notwithstanding, the school offered to let him post his leaflets on bulletin boards in the hallways and to distribute them during lunch, but he rejected its offer and sued.  Id.  The lower court entered a permanent injunction enjoining the school from enforcing its distribution policy absent a showing that distribution would "materially and substantially interfere with the requirements of appropriate discipline . . . ."  Id. at 846.  On appeal, the school argued that it was not bound by the Tinker standard, but instead argued that it could place reasonable time, place, and manner restrictions on students' distribution of literature.  Id.

The Sixth Circuit agreed.  It engaged in a forum analysis and reasoned that because the school had done nothing to open itself up as a public forum, it was permitted to impose time, place, and manner restrictions on speech "so long as the restrictions [were] viewpoint neutral and reasonable in light of the school's interest in the effectiveness of the forum's intended purpose."

10

Id. at 847.  It reasoned that prohibiting distribution in the hallways was legitimate to prevent congestion, confusion, and clutter.  Id.  Importantly, the Sixth Circuit held that the school was not bound to satisfy Tinker because that decision is limited to viewpoint discrimination cases, and not cases where the school merely has a neutral policy that imposes restrictions on the time, place, and manner of speech.  Id. at 849.

The court in Raker performed a somewhat different analysis.  In that case, the plaintiff-student distributed flyers during non-instructional times and wore symbolic clothing while participating in the Pro-Life Day of Silent Solidarity.  470 F. Supp. 2d at 636.  The next day, the principal told him he could only distribute flyers before and after school and not during school hours, as per the school's distribution regulation.  Id. at 637.  The student filed suit seeking an injunction, which the court granted.

The court began its analysis by citing to Tinker, but noted that the defendants argued that a forum analysis should apply instead; that is, argued that the court should look to whether the school used reasonable time, place, and manner restrictions given the non-public forum.  Id. at 639.  Without adopting either a forum analysis or a Tinker analysis, the Raker court performed its analysis under both, finding the school's actions unconstitutional.  Id. at 640-42.  The court reasoned that the school had not made a showing of a reasonable fear of disruption under Tinker, and that its distribution policy was overbroad under a forum analysis because it prohibited all "non-school materials," which showed the regulation was not narrowly tailored.  Id. at 640, 641.

### b.    Intermediate Scrutiny

Defendants also find support for their position in a line of cases applying Tinker to dress codes, though none of them were cited in Defendants' brief.  This line of cases holds that there

11

are essentially five grounds on which a school can regulate speech: 1) when the speech is

disruptive (Tinker), 2) lewd (Fraser), 3) school-sponsored (Hazelwood), 4) promotes drug-use

(Morse), or 5) when the regulation is viewpoint and content neutral.  See Palmer ex rel. Palmer v.

Waxahachie Indep. Sch. Dist., 579 F.3d 502, 509 (5th Cir. 2009), cert. denied, 130 S. Ct. 1055

(2010); see also Bar-Navon v. Brevard County Sch. Bd., 290 Fed. Appx. 273, 277 (11th Cir.

2008); Jacobs v. Clark County Sch. Dist., 526 F.3d 419, 431-32 (9th Cir. 2008).  This line of

cases hold that if a regulation is viewpoint and content neutral, Tinker does not apply and the

court should instead apply intermediate scrutiny.  Palmer, 579 F.3d at 508; Bar-Navon, 290 Fed.

Appx. at 277; Jacobs, 526 F.3d at 434.  Under intermediate scrutiny, a viewpoint and content

neutral school speech policy is constitutional if "(1) it furthers an important or substantial

government interest; (2) the governmental interest is unrelated to the suppression of free

expression; and (3) the incidental restriction on alleged First Amendment freedoms is no greater

than is essential to the furtherance of that interest."  Jacobs, 526 F.3d at 534 (citing Turner Broad.

Sys., Inc. v. F.C.C., 512 U.S. 622, 661-62 (1994)).  These cases limit Tinker review to cases

involving viewpoint discrimination.  See id. at 430.

### c.    Why Tinker Applies

Given the Third Circuit's holding in Saxe, the holdings of the Fifth, Sixth, Ninth, and

Eleventh Circuits do not apply to the case at bar for three reasons.  First, those circuits limit

Tinker review to cases involving viewpoint discrimination.  The Third Circuit has not so

narrowly defined Tinker.  Given its "general rule" holding in Saxe, the court seems to view

Tinker as a catch-all speech standard, rather than a starting point.  In other words, the Third

Circuit treats Tinker as the endpoint of its decision tree in student speech cases, rather than a

12

starting branch.

Second, this case seems to involve viewpoint discrimination.  Setting aside for the moment the language of the dress code policy itself, Plaintiff alleges that she was denied her armband while the school had previously permitted students to participate in the SADD demonstration, where students painted their faces white, wore black shirts over their uniforms, and wore signs around their necks telling the story of someone who was killed as a result of a drunk driver.  That the school previously allowed an exception to the policy, but refused to do so here seems to suggest viewpoint discrimination, thus invoking <u>Tinker</u> even under the standards applied by the circuits above.

Third, neither the Supreme Court nor the Third Circuit has ever applied a fifth category of review to student speech cases, at least where the speech is passive (e.g., armbands, t-shirts). Indeed, given that <u>Tinker</u> itself discusses at the outset that the case is striking a balance between school control and student speech, it seems unnecessary for lower courts to attempt that balance with a different standard, which forum analysis or intermediate scrutiny seems to attempt.  <u>Cf.</u> 393 U.S. at 507 ("On the other hand, the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.  Our problem lies in the area where students in the exercise of First Amendment rights collide with the rules of the school authorities." (internal citations removed)).  The Third Circuit has been clear: if student speech is not lewd, school-sponsored, or advocating drug use, the standard is <u>Tinker</u>.  <u>Saxe</u>, 240 F.3d at 214; <u>Sypniewski</u>, 307 F.3d at 254.  In sum, no need exists to graft a new standard of review onto student speech jurisprudence.

### 2.      Applying the Tinker Standard to the Armband

Having determined that the <u>Tinker</u> standard applies to the armband, it is thus incumbent upon Defendants to show that Plaintiff's speech "would substantially disrupt or interfere with the work of the school or the rights of other students."  <u>Saxe</u>, 240 F.3d at 211.  They must show "a specific and significant fear of disruption, not just some remote apprehension of disturbance." <u>Id.</u>; <u>Sypniewski</u>, 307 F.3d at 253.  The Third Circuit has further held that "if a school can point to a well-founded expectation of disruption-especially one based on past incidents arising out of similar speech-the restriction may pass constitutional muster."  <u>Saxe</u>, 240 F.3d at 212.  Notably however, a school need not wait until disruption or interference actually occurs before it acts. <u>See</u> <u>Sypniewski</u>, 307 F.3d at 254.

As is particularly relevant to this case, the court in <u>DePinto v. Bayonne Board of Education</u>, 514 F. Supp. 2d 633 (D.N.J. 2007) (Greenaway, J.) applied the <u>Tinker</u> standard to a case where fifth grade students wore buttons to school depicting Hitler youth to protest the school's dress code.  The students were punished by the school, and the students brought suit seeking an injunction.  Using <u>Tinker</u>, the court found that the school had failed to demonstrate a substantial disruption.  The school argued that the image on the button itself was inappropriate so they could regulate it under <u>Fraser</u>, which the court rejected as an inappropriate stretching of <u>Fraser</u>'s holding.  <u>Id.</u> at 645.  The school further argued it could control the manner of delivery of the message (i.e., it could require that the student cover the image), which the court also rejected, finding the image was *part of* the message.  <u>Id.</u> at 645-46.

Likewise in <u>K.D. ex rel. Dibble v. Fillmore</u>, No. 05-0336, 2005 WL 2175166 (W.D.N.Y. Sept. 6, 2005), the court applied the <u>Tinker</u> standard to a case where a high school sophomore

14

wore a t-shirt to school with the message: "Abortion is Homicide" "You will not silence my message.  You will not mock my God.  You will stop killing my generation.  Rock for Life!"  Id. at *1.  The school asked the student to remove the shirt, turn it inside-out, or otherwise cover the message.  He was advised that if he did not comply, he would be forced to go home.  The student brought suit seeking an injunction.  Before the court, the school argued that its actions were permissible because: 1) the t-shirt was factually inaccurate (abortion is in fact legal and thus not homicide); 2) the content of the shirt was a direct attack (i.e., it offended) students who had undergone or contemplated abortion; 3) the word "homicide" is objectionable because it connotes violence; and 4) because the school also housed elementary students, the topic of abortion was inappropriate.  Id. at *5.  Applying Tinker, the K.D. court found the school's actions unconstitutional.  The court found that there was no evidence that the student's t-shirt caused any disruption or that any students' rights were infringed, though perhaps some may have been "upset."  Id. at *6.

In this case, Defendants argue that they had a reasonable fear of disruption from the armband based on their past and on-going enforcement of the dress code policy.  Def. br. at 11.  Their argument in effect is that because they have and continue to vigorously enforce the dress code policy, permitting a student to violate it by wearing an armband will "undermine enforcement."  Id.  Defendants then invoke the slippery slope by arguing that "[t]he floodgates, in effect, would be flung wide open and the District's dress code policy would be washed away in the process."  Id.  At oral argument, Defendants argued that if they permit Plaintiff's proposed speech, they will have to do so for the gangs, or also that they subject themselves to claims of arbitrary enforcement.  Plaintiff points out that Defendants only have expressed a fear of

disruption, which is not enough, and also that Plaintiff's proposed manner of wearing the armband (on her arm rather than on her shirt sleeve) would not have actually violated the policy. Pl. reply at 5.

On the record presented, the Court finds that Defendants have not met their burden under Tinker. Defendants' argument effectively is that if they are not permitted to continue to enforce the dress code in an unbridled manner, then the school will have disruptions. This is simply not a specific and significant fear of disruption and is an otherwise poor basis for stripping a student of her rights.

Defendants have only articulated a general fear of disruption. They have not presented any convincing argument that students will in fact become disruptive simply because one student is wearing a plain armband. In fact, students previously participated in the SADD demonstration and seemingly nothing happened. Moreover, Defendants' fear of a resurgence of gang violence is unfounded fear-mongering. Nothing about the Tinker standard or this decision handcuffs their ability to control a legitimate fear of disruption. Certainly this decision should not be read to hold that the school cannot prohibit student speech that will (or that they reasonably perceive will) lead to violence. And certainly Defendants can and should respond to each proposed incident of speech as it arises. Cf. Sypniewski, 307 F.3d at 257 (holding school must engage in a case-by-case analysis when restricting speech). But as to Plaintiff's proposed armband, Defendants have made no sufficient showing that their enforcement of the school's policies was grounded in sufficient constitutional footing. That the policies were, as Defendants repeatedly noted, drafted by the local school board does not give a constitutional blessing to their enforcement. Defendants still need to satisfy the Tinker standard, and they have not done so

16

here.  Therefore, Defendants are enjoined from preventing Plaintiff from wearing the armband.[9]

      **C.**      **Standard to Apply-Flyers**

However, the standard the Court should apply to the flyers is somewhat less clear.

Whether the proposed distribution of flyers during non-instructional times is subject to a forum

analysis or a <u>Tinker</u> disruption analysis has not be squarely decided by the Third Circuit.  The

arguments of the parties are essentially the same as those above: Defendants assert that the flyers

should be subject to a "forum analysis," Plaintiff says a <u>Tinker</u> disruption analysis applies.

It should be noted at the outset that the Supreme Court has held that handing out leaflets

"in the advocacy of a politically controversial viewpoint [] is the essence of First Amendment

expression."  <u>McIntyre v. Ohio Elections Comm'n</u>, 514 U.S. 334, 347 (1995).  Nevertheless, the

few times the Third Circuit has addressed the question of distribution, the party seeking to

distribute flyers was non-students, <u>see, e.g.</u>, <u>Child Evangelism Fellowship of New Jersey Inc. v.</u>

<u>Stafford Twp. Sch. Dist.</u>, 386 F.3d 514 (3d Cir. 2004), <u>Gregoire v. Centennial Sch. Dist.</u>, 907

F.2d 1366 (3d Cir. 1990), or were students wishing to hand out materials during instructional

time.  <u>See</u> <u>Walz ex rel. Walz v. Egg Harbor Township Bd. of Educ.</u>, 342 F.3d 271 (3d Cir. 2003).

In the cases where the proposed distributor was a non-student, the court performed a forum

analysis, and then decided whether the school imposed proper restrictions given the nature of the

forum.  <u>See</u> <u>Child Evangelism</u>, 386 F.3d at 526; <u>Gregoire</u>, 907 F.2d at 1370-71.

Perhaps the best indication of what the Third Circuit might do when faced with this

question comes from Judge Stapleton in dissent in <u>Gregoire</u>.  In a case where a religious

---

[9] However, should Plaintiff's wearing of the armband give rise to the type of disruption
discussed in <u>Tinker</u> and related cases, Defendants of course can take appropriate action.

organization sought to distribute literature at a public school, Judge Stapleton noted that the Third Circuit had never decided whether *students* have a right to distribute religious literature on school grounds during the school day.  Gregoire, 907 F.2d at 1393 (Stapleton dissenting).  He then cited to Thompson v. Waynesboro Area School District, 673 F. Supp. 1379 (M.D. Pa. 1987) as an example of a case that had done so.  Id.  The majority in Gregoire also cited to Thompson at least twice.  Id. at 1378 n.10, 1383 n.16.

In Thompson, junior high students distributed copies of a religious newspaper in the hallway of their school.  The school later restricted the distribution of the newspaper to the sidewalk and parking lot of the school prior to 7:50 a.m.  673 F. Supp. at 1380.  The students subsequently distributed the newspaper again in the hallways, in defiance of the restrictions, and they were suspended.  They brought suit.  The court took a hybrid approach in finding that the school's actions were unconstitutional.  It first applied a forum analysis, determining that the school was a limited public forum.  Id. at 1387.  The court then applied Tinker to determine if the school had used narrowly drawn restrictions in light of the forum.  Id. at 1387.  Against this background, the court determined that the school's restrictions were not narrowly drawn because there was no evidence of any disruption, nor any evidence that the distribution interfered with the rights of others.  Id. at 1392.  The court also took exception to the school requiring the students to exercise their speech "outside the 'schoolhouse gate.'"  Id.

Other courts that have addressed the student distribution issue have likewise applied a forum analysis.  See Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118, 9 F.3d 1295, 1300 (7th Cir. 1993); M.B. ex rel. Martin v. Liverpool Cent. Sch. Dist., 487 F. Supp. 2d 117, 131-32 (N.D.N.Y. 2007).

18

### 1.        Does the Tinker Standard Apply?

Notwithstanding the above, the proper standard for analyzing a school's restrictions on a student's attempted leafleting seems to be a <u>Tinker</u> analysis and not a forum analysis.  Nothing about the general rule discussed in <u>Saxe</u> seems to limit its standards to just armbands, t-shirts, or button wearing.  The four modes of analysis from the Third Circuit seem to apply to any school restrictions on student speech.  This is likely especially true where the speech (leafleting) is described as the "essence of the first amendment."  <u>McIntyre</u>, 514 U.S. at 347.  Although there is room to limit <u>Tinker</u> to just passive speech cases (i.e., *just* armbands, t-shirts, buttons, etc.), nothing about the mere handing out of literature without more (e.g., accosting the student with the literature) seems to transform this essential speech into something requiring less protection.  <u>Cf.</u> <u>Tinker</u>, 393 U.S. at 508 ("[This case] does not concern aggressive, disruptive action or even group demonstrations.  Our problem involves direct, primary First Amendment rights akin to 'pure speech.'"); <u>K.D.</u>, 2005 WL 2175166, at *6 (holding student's wearing pro-life shirt not disruptive, noting student was "not accosting fellow students with buttons or flyers imprinted with his message" (citing <u>Blackwell v. Issaquena County Bd. of Educ.</u>, 363 F.2d 749 (5th Cir. 1966) where "evidence demonstrated that students entered classes in session, disrupting lessons to distribute buttons, and harassed those students who refused to wear the buttons voluntarily").  More importantly, even the <u>Thompson</u> court ultimately applied a disruption analysis in striking down the school's attempted restriction of the student's distribution.

From another angle, as noted by Judge Greenaway in <u>DePinto</u>, a school cannot consistent with the First Amendment regulate the form of a student's proposed speech.  <u>See</u> 514 F. Supp. 2d at 645-46 (citing <u>Guiles ex rel. Guiles v. Marineau</u>, 461 F.3d 320, 331 (2d Cir. 2006)).  In fact, in

Guiles ex. rel Guiles v. Marineau, where a school required a student to tape over portions of his shirt that offended the school dress code, the Second Circuit held that the school's actions "diluted [the student's] message, blunting its force and impact.  Such censorship may be justified under Tinker only when the substantial disruption test is satisfied."  461 F.3d at 331.  Likewise here, requiring Plaintiff to not use the flyers or to otherwise limit their use would blunt the message she is trying to convey.  To the extent that Defendants are concerned about the collateral effects of paper distribution in the hallways  (e.g., clutter, congestion, tardiness), the Tinker standard seems broad enough to permit a school to control them.

### 2.    Applying the Tinker Standard to the Flyers

Defendants argue that if Plaintiff had been permitted to distribute flyers to fellow students, "there would have been significant potential for not only disruption of the educational process, but also for emotional injury, degradation, disgrace and discomfort" in violation of the harassment and equal education policies.  Def. br. at 12.  They further insist that the flyers were "graphic and inflammatory" because of the topic they touch upon and because of the language they use (e.g, "being killed"; "ripped from the safety and warmth of their mothers' wombs"; "abortion holocaust").  Id.  They note that they have several students who have had abortions, and "some are likely struggling with that moral dilemma right now."  Id.  Plaintiff asserts that merely because the flyers would have caused discomfort, does not mean that they could be prohibited.  Pl. reply at 6.  Plaintiff further asserts that the language of the flyers is no more inflammatory than the language used in the SADD demonstration, in which the students wore signs explaining how they were "killed."  Id. at 7.

On the record presented, Defendants have not met their burden under Tinker.  Many of

20

Defendants' challenges to the flyers were rejected in K.D. v. Fillmore, where a student wore a t-shirt saying "Abortion is Homicide."  2005 WL 2175166, at *1, *5.  There the court rejected that the language was too aggressive or would potentially cause harm to students who have had abortions.  Id. at *5, *6.  The court noted that students do not have a right to not be upset, and nothing about the student's shirt otherwise caused a disruption.  Here Defendants are likewise arguing that some students might get upset.  Perhaps if they could show that some actually were and this somehow caused a disruption to the learning environment, then they would satisfy their burden under Tinker.  Cf. Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. #204, 523 F.3d 668, 674 (7th Cir. 2008) (holding "we infer that if there is reason to think that a particular type of student speech will lead to a decline in students' test scores, an upsurge in truancy, or other symptoms of a sick school-symptoms therefore of substantial disruption-the school can forbid the speech").  But they have made no such showing on the record.  Therefore, the Court must grant Plaintiff's Motion and enjoin Defendants' prohibition on the distribution of the flyer.[10]

Finally, because the Court otherwise agrees with Plaintiff's as applied challenges, the Court will not decide whether the applicable policies are facially unconstitutional.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion is **GRANTED** and Defendants are **PERMANENTLY ENJOINED** from prohibiting Plaintiff from wearing the armband or distributing the flyers absent a well-founded expectation of disruption.  An appropriate Order shall follow.

---

[10] However, should Plaintiff's distribution of the flyers give rise to the type of disruption discussed in Tinker and related cases, Defendants of course can take appropriate action.

Date:__4-22-10_____                                  __/s/ Robert B. Kugler_____
                                                      ROBERT B. KUGLER
                                                      United States District Judge